# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-299V**

|  |  |
|---|---|
| JON ERIC JENSEN, | Chief Special Master Corcoran |
| Petitioner, | Filed: May 26, 2026 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Daniel Alholm, Alholm Law PC, Chicago, IL, for Petitioner.*

*Nina Ren, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On February 28, 2023, Jon Eric Jensen filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). ECF No. 1. Petitioner filed an Amended Petition on June 1, 2023. ECF No. 7 ("Am. Petition"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of a hepatitis A ("Hep A") vaccine received on March 2, 2020. Am. Petition at ¶¶ 2, 10, 15.

After review of the record and consideration of the parties' arguments, I conclude that Petitioner has established by preponderant evidence that he experienced the residual

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

effects of his injury for more than six months. Further, Petitioner has preponderantly demonstrated that his left shoulder pain began within 48 hours of vaccination, that his pain was limited to his left shoulder, and that no other condition or abnormality would explain his symptoms. Petitioner has established all other requirements for a Table SIRVA as well, and he is therefore entitled to compensation.

## I.      Procedural History

On September 13, 2023, this case was assigned to the Special Processing Unit of the Office of Special Masters. ECF No. 11. The parties attempted to informally resolve the matter, but reached an impasse by July 3, 2024. ECF No. 24. On August 28, 2024, Respondent filed a Rule 4(c) Report setting forth his position that compensation would not be appropriate under the Vaccine Act. ECF No. 25 ("Rule 4(c) Report").

On October 10, 2024, I entered a scheduling order setting deadlines for briefing, and for Petitioner to file any additional evidence. ECF No. 27. Petitioner filed a brief in support of entitlement on November 22, 204. ECF No. 28 ("Pet'r Br."). Respondent filed a response brief on December 30, 2024. ECF No. 29 ("Resp't Br.). Petitioner filed a reply on January 8, 2025 ("Pet'r Reply"). This matter is ripe for adjudication.

## II.     Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.      Petitioner's Vaccination and Initial Complaint of Left Shoulder Pain

At the time of vaccination, Petitioner was 62 years old and resided in a suburb of Chicago. Ex. 2 at 1; Ex. 3 at 9. Petitioner had retired from his career as a network news soundman. Ex. 4 at 98. Petitioner is also a musician and plays the drums. Ex. 3 at 114. Petitioner's medical history included chronic obstructive pulmonary disease, hypertension, high cholesterol, coronary artery disease, and back pain.[3] *Id.* at 14-15. Petitioner did not have any history of injury or dysfunction in his *left* shoulder, but had recently undergone physical therapy ("PT") for *right* shoulder pain attributed to a strain or tear caused by lifting a musical instrument. *Id.* at 10, 14.

---

[3] Dr. Parker noted that for his back pain, Petitioner had a prescription for hydrocodone-acetaminophen ("Norco"), but rarely used it and had not received any refills since 2015. Ex. 3 at 10. The relevance of this prescription is discussed further below in regard to onset.

On March 2, 2020, Petitioner saw a new primary care provider ("PCP"), Dr. Ellen Parker, at Loyola Medicine. *Id.* at 10. At this appointment, Petitioner discussed his chronic conditions, as well as his ongoing right shoulder pain and new left foot pain.[4] *Id.* Petitioner was planning on traveling to the Caribbean and received the Hep A and typhoid vaccine in his left deltoid. *Id.* at 14, 17.

Petitioner contends in his declaration that he immediately experienced intense pain at the injection site that caused him to return to the clinic that evening as it was closing. Ex. 2 at 1. Petitioner further states that he was not able to be treated beyond receiving a prescription for pain medication. *Id.* Petitioner's Loyola Medicine records contain an information sheet for a visit at 7:27 pm on March 2, 2020, with provider Dr. John Boblick. Ex. 3 at 34. Although the sections for Petitioner's reason for visit and problems were left blank, a new entry dated March 2, 2020, for 15 Norco pills was added to his list of medications. This entry did not appear on the medication list generated for his appointment earlier that day. *Compare id.* at 18 *with id.* at 37.

On March 31, 2020, Petitioner telephoned Loyola Medicine requesting to speak to Dr. Parker "re PT for his lt arm." *Id.* at 59-60. Dr. Parker contacted Petitioner on April 1, 2020 and documented that he was experiencing pain in the 6-7/10 range when he raised his arm above his head. *Id.* at 66. However, Petitioner's pain had overall improved and he was able to sleep at night. *Id.* Petitioner was taking "half of [N]orco," but did not need ice or anything else. *Id.* Dr. Parker advised Petitioner to "[h]old off on PT until after covid 19." *Id.*

### B.    Petitioner's Treatment of His Left Shoulder Through September 2020

On June 9, 2020, Petitioner saw Dr. Parker for the primary complaint of clogged ears, but also discussed his left shoulder pain. Ex. 3 at 98. Dr. Parker wrote that Petitioner had "[d]eveloped vaccine related to reaction [sic] to shoulder." *Id.* Petitioner had "acute sever[e] pain" and required "narcotics for 1-1.5 months to help with severe pain." *Id.* Further, Petitioner's mobility had improved somewhat and he was now able to sleep on his side, but still had limited range of motion ("ROM") with pain at the end ranges. *Id.* Dr. Parker diagnosed Petitioner with arthropathy of the left shoulder related to vaccine injection and referred him for a PT evaluation.[5] *Id.* at 100.

---

[4] In listing Petitioner's complaints, Dr. Parker noted that Petitioner reported "chronic *left* shoulder pain." *Id.* (emphasis added). However, Respondent does not assert that Petitioner had a pre-existing left shoulder injury and admits that Dr. Parker "initially erroneously wrote left shoulder, but the overall note supports that [P]etitioner was discussing his right shoulder." Rule 4(c) at 2 n.1.

[5] Dr. Parker also specifically noted that Petitioner had baseline right shoulder arthropathy and that his left shoulder pain was not related to this issue. Ex. 3 at 100.

Petitioner received an initial PT evaluation on June 24, 2020. *Id.* at 144. When filling out the intake forms for this appointment, Petitioner wrote "3-3?-20" as the date the problem started, and added the notation "when I received a vaccine too high on arm." *Id.* at 953. In his progress notes, the physical therapist documented a more general onset date of "3/2020." *Id.* Petitioner reported pain with moving his arm above his shoulder, which affected his ability to play drums, wash his hair, and dress himself. *Id.* He also reported "some numbness/tingling in the half of the ring finger and pinky finger." *Id.*

Nonetheless, beginning in July 2020 the physical therapist described improvement in Petitioner's condition. *See* Ex. 3 at 428. For example, the physical therapist repeatedly noted that Petitioner did not have any pain at the beginning of each session. *See id.* at 523-24. On July 17, 2020, Petitioner had no pain and full shoulder ROM post-therapy. *Id.* at 524. On July 20, 2020, Petitioner only had sharp pain "with palpation to injection site." *Id.* On July 22, 2020, Petitioner sometimes had pain at rest, but only had "minimal episodes of sharp pain" in his left shoulder. *Id.* By July 27, 2020, Petitioner reported that he had been moving a lot and believed his pain was "more from overuse." *Id.* at 429. Petitioner would have sharp pain "sometimes," but "not like previously."[6] *Id.*

During this same time period, Petitioner was preparing to move to another part of Illinois, where his father was living in a nursing home. *See* Ex. 2 at 2; Ex. 3 at 428. Petitioner reported injuries caused by his these activities to the physical therapist. In particular, at his August 10, 2020 session, Petitioner stated that he was in 8/10 pain after an incident in which he had been cleaning his walls and overextended his shoulder when the step stool started sliding underneath him. *Id.* at 460. Petitioner stated that he was "doing really well" up to that point.[7] *Id.* Similarly, on August 27, 2020, Petitioner again complained of 8/10 pain and stated that his condition had been improving until he had caught himself against the wall. *Id.* at 557. The physical therapist added that prior to this accident, Petitioner "was demonstrating full shoulder ROM with minimal pain and no sharp episodes of pain."[8] *Id.* at 560.

On September 1, 2020, Petitioner saw Dr. Parker regarding his left shoulder pain. *Id.* at 602. Dr. Parker wrote that Petitioner's symptoms "all started in February after vaccine administration." *Id.* Petitioner stated that his pain and mobility were improving

---

[6] On July 27, 2020, Petitioner again reported some numbness/tingling in his left ring and pinky fingers. *Id.* at 429. Petitioner stated that this issue was "present prior to the shoulder pain." *Id.* The physical therapist performed cervical traction, which resolved the numbness/tingling. *Id.* Petitioner described the same issue and received cervical traction again on September 17, 2020. *Id.* at 705.

[7] Petitioner also had increased pain on August 17, 2020 after cleaning and mopping his floors for a prolonged period of time. *Id.* at 526.

[8] Petitioner participated in 11 PT sessions through August 27, 2020. *See id.* at 179-210, 305-557.

until the wall incident, which Dr. Parker characterized as an exacerbation of his previous pain. *Id.* at 602-03. In light of the prolonged duration of Petitioner's symptoms, Dr. Parker diagnosed him with adhesive capsulitis instead of bursitis. *Id.* at 605. Dr. Parker referred Petitioner to an orthopedist and ordered an MRI.[9] *Id.*

Petitioner had two further PT sessions on September 17 and 21, 2020. Petitioner continued to have sharp pain when reaching overhead and with sudden movements, although he no longer had any pain going into each session. *Id.* at 705, 738. At the end of September 2020, Petitioner left the Chicago area. *Id.* at 738. Due to this move, he was discharged from PT with a home exercise plan. *Id.*

### C.   Petitioner's Treatment of His Left Shoulder Through February 2024

Petitioner's father passed away in October 2020. Ex. 2 at 2. Petitioner then continued to live in his father's house in southern Illinois while he and his wife prepared to move to the Nashville, Tennessee area. *Id.* Petitioner and his wife relocated to Tennessee in April 2021. During this time, Petitioner did not have a PCP and did not have any other appointments. Petitioner's first encounter with the medical system in Tennessee was on June 28, 2021, when he went to the emergency department of Vanderbilt University Medical Center ("Vanderbilt") with abdominal pain. Ex. 4 at 1307. Petitioner did not discuss his left shoulder.

On September 10, 2021, Petitioner had a new patient appointment with Dr. Marguerite Lloyd at Vanderbilt primary care.[10] *Id.* at 1286. Among other concerns, Petitioner complained of pain and limited mobility in his left shoulder that had "started immediately following a vaccine injection in 2020." *Id.* Dr. Lloyd believed that Petitioner's symptoms were "suggestive of rotator cuff tendinopathy, but acute onset after vaccination would favor a neuropathy." *Id.* at 1290. Dr. Lloyd ordered x-rays and referred Petitioner to orthopedics. *Id.*

Petitioner saw Vanderbilt orthopedist Dr. Vincent Novak on September 16, 2021. *Id.* at 1236. Dr. Novak recorded the onset of Petitioner's left shoulder symptoms as "January/February 2020 when he received vaccinations in preparation for travel to the Dominican Republic." *Id.* Petitioner first noticed "significant albeit transient pain" and soreness, but then five hours later experienced "the most excruciating pain" that he had ever had. *Id.* Petitioner only had "equivocal relief" from his earlier PT. *Id.* Petitioner still complained of pain with activity, particularly when reaching overhead. *Id.* Petitioner also

---

[9] Petitioner did not see an orthopedist at this time and his insurance denied the MRI. *See id.* at 705.

[10] Petitioner stated in his declaration that after he moved to Tennessee, he had difficulty finding a PCP and had to wait several months to get an appointment as a new patient. Ex. 2 at 2.

stated that his symptoms had not improved over the past year and were affecting his daily activities and quality of life – in particular, he had lowered the height of his drums to accommodate his left shoulder. *Id.*

Dr. Novak found that Petitioner's examination was "suspicious for possible supraspinatus pain/weakness against resistance, cannot rule out degenerative [rotator cuff tear]" with "[u]ncertain relation to previous vaccinations." *Id.* at 1237. Dr. Novak also took x-rays and noted some degenerative AC joint changes, although Petitioner denied AC joint tenderness. *Id.* Dr. Novak discussed various treatment options, although both he and Petitioner decided against the need for a steroid injection that day. *Id.* Petitioner decided to try a short course of oral steroids and to proceed with an MRI. *Id.*

On September 22, 2021, Petitioner returned to Dr. Novak to review his MRI results.[11] *Id.* at 1159. Petitioner then saw Dr. Novak's colleague, orthopedist Dr. Leonard Cox, on September 23, 2021, for a second opinion. *Id.* at 1142-43, 1160. Dr. Cox diagnosed Petitioner with left AC degenerative joint disease and biceps tendinitis. *Id.* Dr. Cox performed a large joint arthrocentesis and steroid injection in Petitioner's left shoulder. *Id.* at 1141-43. At his next appointment with Dr. Cox on October 11, 2021, Petitioner reported "good transient relief" from this treatment. *Id.* at 1084.

Petitioner saw Dr. Lloyd on December 10, 2021, for his annual physical. *Id.* at 1019. The appointment appears to have been focused on Petitioner's unrelated chronic health conditions. *See id.* at 1019-25. With regard to his left shoulder, Petitioner noted that he was performing his home exercise plan. *Id.* at 1019. Four months later, on April 13, 2022, Petitioner followed-up with Dr. Lloyd. *Id.* at 867. Petitioner stated that the steroid injection had been helpful, but now the pain was coming back. *Id.* Dr. Lloyd encouraged Petitioner to return to his orthopedist for another injection. *Id.* at 869.

Petitioner did not immediately return to Dr. Cox. Instead, he was treated for unrelated issues, including a hospitalization for bloody stools, from April to September 2022. *See id.* at 411-14, 478, 674, 840. On September 8, 2022, Petitioner saw Dr. Lloyd. *Id.* at 411. Petitioner again mentioned that the left shoulder steroid injection had been helpful, but that the pain was starting to get worse.[12] *Id.*

---

[11] Petitioner underwent an MRI on September 20, 2021. Ex. 4 at 1214. The MRI revealed degenerative tearing of the glenoid labrum, marked supraspinatus tendinosis with bursal side fraying, moderate infraspinatus tendinosis, moderate biceps tendinosis, and moderate AC osteoarthritis. *Id.* at 1215.

[12] Petitioner also mentioned sharp pain in his left elbow. *Id.* at 411. Dr. Lloyd believed that this issue was caused by repetitive movements while drumming. *Id.* at 413.

Petitioner returned to Dr. Cox on September 22, 2022. *Id.* at 381. Based on Petitioner having received "good transient relief for one year," Dr. Cox provided a second large joint arthrocentesis and steroid injection. *Id.* However, at his next annual physical exam with Dr. Lloyd on January 12, 2023, Petitioner reported that this injection had not helped much.[13] *Id.* at 239. Petitioner saw Dr. Cox again on February 23, 2023 and received a third large joint arthrocentesis and steroid injection in his left shoulder. *Id.* at 168.

For the next year, Petitioner received treatment for unrelated conditions. On February 29, 2024, Petitioner returned to Dr. Cox and received a fourth large joint arthrocentesis and steroid injection. Ex. 5 at 3. Dr. Cox also referred Petitioner to PT for scapular mechanics. *Id.* However, Petitioner did not file any further medical records.

## III.    Ruling on Entitlement

### A.    Legal Standards

To receive compensation under the Vaccine Program, a petitioner must prove either (1) that he suffered an injury falling within the Vaccine Injury Table, or (2) that he suffered an injury that was actually caused by his vaccine. *See* Sections 13(a)(1)(A), 11(c)(1). In either case, however, a petitioner must *also* demonstrate that the injured person has "suffered the residual effects or complications of his illness, disability, injury, or condition for more than six months after the administration of the vaccine."[14] Section 11(c)(1)(D)(i). Petitions are appropriately dismissed for failure to substantiate the severity requirement. *See, e.g.*, *Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré syndrome resolved less than two months after onset).

The petitioner carries the burden of establishing the matters required in the petition, including the severity requirement, by a preponderance of the evidence. Section 13(a)(1)(A); *see Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65-66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 2014). Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987),

---

[13] Petitioner also reported left knee pain, potentially caused by drumming, to Dr. Lloyd. *Id.* at 244.

[14] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

The Vaccine Act prohibits finding that a petitioner has met this burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a). Medical records must be considered, *see* Section 13(b)(1), and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine R. 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

8

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

## B.    Petitioner Has Established Severity by a Preponderance of the Evidence

In order to meet the statutory six-month severity requirement, Petitioner must preponderantly demonstrate that he suffered the "residual effects or complications" of his claimed injury beyond September 4, 2020 (based on a post-vaccination onset of no later than March 4th). *See* Section 11(c)(1)(D)(i). Respondent argues, based on the physical therapist's notes from July 2020, that Petitioner's condition had resolved by that time, and thus two months prior to the severity cut-off. Rule 4(c) Report at 13; Resp't Br. at 8 (citing Ex. 4 at 524). Further, Respondent suggests that Petitioner's pain from August 2020 onward was caused by a new injury that he sustained while cleaning his walls, or from his housework in general. *See id.*

Respondent's interpretation of Petitioner's medical records is overly circumscribed. Although Petitioner had significantly improved by July 2020, I do not read the physical therapist's notes as evidence that Petitioner was fully pain-free and without any residual effects of his injury. Petitioner's pain may have been "minimal," *see* Ex. 4 at

9

524-25, 560, but I give significant weight to the fact that he had not been discharged from PT. Notably, even before the wall cleaning incident, the physical therapist indicated that Petitioner would continue to benefit from intervention to improve his condition. *See id.* at 523-24. Petitioner's accident while cleaning his walls may certainly have set back his recovery or aggravated his condition, but the physical therapy records support Petitioner's position that his initial left shoulder pain did not resolve within six months.

Petitioner's appointment with Dr. Parker on September 1, 2020, is also highly probative. Crucially, very close to the end of the six-month requirement, Dr. Parker referred Petitioner to orthopedics and for imaging due to the "prolonged duration since initial vaccine related injury occurred [sic] and symptoms not improving[.]" Ex. 3 at 605. Dr. Parker's note that Petitioner braced his left arm on the wall to prevent falling and "pain got exacerbated," clearly implied that he had still had an underlying level of existing pain. *Id.* at 602. I can thus reasonably conclude that Petitioner's original left shoulder pain continued to September 4, 2020.

Further, Respondent ignores the probative value of all of Petitioner's subsequent treatment. Not only did Petitioner have two additional PT sessions later in September 2020, beyond the six month point, but Petitioner received orthopedic treatment from September 2021 through February 2024. At all of these appointments, and in setting out the history of his left shoulder pain, neither Petitioner nor his treaters ever presented a timeline of a vaccine-related injury that had resolved in July/August 2020 prior to a separate injury from cleaning. The records demonstrate that Petitioner treated his left shoulder pain, albeit intermittently, well beyond the required minimum of six months after onset.

### C.   Petitioner Has Established the Onset of Left Shoulder Symptoms Within 48 Hours Post-Vaccination by Preponderant Evidence

Respondent's premise for challenging onset was that Petitioner did not seek medical attention for his left shoulder until his contact with Dr. Parker on March 31, 2020, nearly a month after vaccination. Rule 4(c) Report at 9. After Petitioner responded that he in fact returned to the clinic later in the day (on March 2, 2020) and received a hydrocodone prescription, Pet'r Br. at 2-3, Respondent argued that the records did not corroborate Petitioner's assertion that he took this action because of left shoulder pain. Resp't Br. at 9. Instead, Respondent contended that Petitioner was merely complying with an earlier instruction of Dr. Parker to return for a refill request. *Id.* 2, 9.

I do not find Respondent's contention to be persuasive because it relies on altering the meaning of Dr. Parker's notes with misleading parentheticals. According to Respondent, Dr. Parker told Petitioner "to [first] get [his] pill pack to send refill requests."

10

*Id.* at 9. However, the parentheticals "[first]" and "[his]" were inserted out of whole cloth by Respondent. In fact, the correct and complete quotation is "Refills: non yet – pt to get pill pack to send refill requests."[15] Ex. 3 at 15. Petitioner's records make clear that "PillPack" was Petitioner's preferred online pharmacy. *See* Ex. 3 at 10, 80, 991; Ex. 4 at 497, 513, 516, 980-82, 1025. Respondent's parentheticals incorrectly suggest that Petitioner was required to obtain some item before receiving prescription refills, and that he went back to the clinic on the evening of March 2, 2020 to fulfill this task. Without the parentheticals, the key sentence does not state anything more than Petitioner would be using PillPack to contact his treaters when his prescriptions needed refilling. I therefore agree with Petitioner that it would have been unlikely for a doctor to see him again the same day, without an appointment, and to prescribe him a narcotic pain medication, unless he had complained of sudden and severe pain related to his vaccination.[16] *See* Pet'r Br. at 3.

Further, Respondent does not correctly read Petitioner's other records regarding onset. Contrary to Respondent's assertion, Petitioner also did not report an immediate onset for the first time in September 2021. *See* Resp't Br. at 9. Although Petitioner did not specify when onset occurred when speaking to Dr. Parker on April 1, 2020, Ex. 3 at 66, at his June 9, 2020 appointment, he did indicate that he had acute, severe pain following the vaccination.[17] *Id.* at 98. Petitioner also specified that his problem started on "3/3?/20" when filling out the PT forms on June 24, 2020. In consideration of all of this evidence, Petitioner has demonstrated that the onset of shoulder pain more likely than not began within 48 hours of vaccination.

---

[15] Dr. Parker's note appears to contain a typographical error and was meant to be "none yet." The implication that Petitioner did not have any refills yet also cuts against Respondent's argument that he was seeking a prearranged refill when he returned to the clinic in the evening.

[16] In any event, even putting aside Petitioner's return to the clinic on March 2, 2020, a delay of slightly less than one month to seek treatment would be relatively short in a SIRVA case. I have often stated that it is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own.

[17] Respondent asserts that Petitioner "appeared to identify onset as having occurred between late April to early May 2020" at this June 9, 2020 appointment. Resp't Br. at 9 (describing Ex. 3 at 98). There is nothing on this page of Dr. Parker's notes stating these particular dates. Respondent may be misinterpreting Dr. Parker's comment that Petitioner "[r]equired narcotics for 1-1.5months to help with severe pain" in his left shoulder. *See* Ex. 3 at 98. This phrase is more reasonably interpreted in context as that Petitioner's pain began shortly after vaccination and required narcotics for 1-1.5 months before improving. *See id.*

### C. Petitioner Has Established that His Pain and Reduced ROM Were Limited to His Left Shoulder

With regard to the third QAI criterion, Respondent emphasizes Petitioner's complaints of "some numbness/tingling in the half of the ring finger and pinky finger." Rule 4(c) Report at 10 (citing Ex. 3 at 144).[18] However, I agree with Petitioner that evidence of this symptom does not necessarily preclude a favorable entitlement determination. *See* Pet'r Br. at 4-5. I have in other cases found that two record mentions of neurological symptoms such as numbness or tingling were not disqualifying because the petitioner's complaints and treatment were focused and aimed at her shoulder. *See, e.g.*, *Schmaltz v. Sec'y of Health & Hum. Servs.*, No. 21-47V, 2023 WL 7104811, at *5 (Fed. Cl. Spec. Mstr. Sept. 22, 2023).

Here, Petitioner consistently received treatment for a musculoskeletal injury of the left shoulder without any competing etiology. Petitioner further clarified to the physical therapist that this numbness/tingling preexisted his left shoulder pain. *See* Ex. 3 at 429. The physical therapist also appears to have treated this issue as arising from the cervical spine, and unrelated to the left shoulder. Petitioner has preponderantly established this element.

### D. Petitioner Has Established that He Did Not Have Any Other Condition or Abnormality that Would Explain His Symptoms

Respondent's final argument is that Petitioner has not established the fourth QAI criterion because he "engaged in strenuous physical activity throughout the treatment period, including working on his home and playing the drums." Rule 4(c) Report at 10; Resp't Br. at 10. As proof, Respondent points to Petitioner's complaints of pain caused by cleaning his house, the near-fall while cleaning his walls, and injuries to his foot and elbow from drumming. *See id.* Respondent misses the mark for several reasons.

First, "strenuous physical activity" by itself does not reasonably constitute a "condition or abnormality" as contemplated by the QAI. The QAI uses the examples of "NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy" as disqualifiers. *See* 42 C.F.R. § 100.3(c)(10)(iv). These are all problems with the biological processes of a petitioner's body and therefore, logically, a petitioner's hobbies or physical activities do not fall within this rubric.

Second, and as discussed with regard to onset, Petitioner did not receive any separate diagnosis or treatment for injuries attributed to his housework or drumming.

---

[18] Respondent did not discuss this QAI element in his brief.

Petitioner certainly may have exacerbated the condition of his left shoulder in July/August 2020, but his complaints of cleaning-related pain would not fully explain his symptoms. Similarly, to the extent that Respondent relies on the inclusion of degenerative changes in Petitioner's imaging, this was never discussed as a complete explanation for Petitioner's symptoms. *See* Rule 4(c) Report at 10; Resp't Br. at 10. There is also no suggestion in the record that Petitioner had any pre-existing injury to his left shoulder caused by his physical activities.

Third, Respondent overall exaggerates the record. Other than the period in which he was moving to southern Illinois, Petitioner did not either before or after mention any exercise injuries or related issues. Respondent also incorrectly relies on Petitioner's foot and elbow pain to suggest that playing the drums injured his shoulder, when he made no such complaint to any treater.

Respondent's arguments about possible intervening or contributory factors are better considered as going to the amount of damages Petitioner should receive. Any part of Petitioner's symptomology that was caused by his cleaning or other activities would not be compensable. Petitioner also cannot receive compensation for treatment of non-SIRVA issues.

## Conclusion and Scheduling Order

Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, he need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements.[19] Section 11(c)(A), (B), and (D).

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a Table SIRVA following the March 2, 2020 Hep A vaccination.**

---

[19] Respondent also argued that because Petitioner received the non-covered typhoid vaccine in the same arm and at the same time as the Hep A vaccine, he could not preponderantly establish that his left shoulder symptoms were caused by a covered vaccine. Rule 4(c) Report at 9; Resp't Br. at 10. However, Respondent has not argued that the non-covered typhoid vaccine was the actual cause of Petitioner's injury. I have recently explained that because a covered vaccine was clearly obtained by the petitioner, "it cannot be excluded as a 'substantial factor' in his injury – even if the non-covered vaccine was also deemed causal." *Benkiel v. Sec'y of Health & Hum. Servs.*, No. 22-1585V, 2025 WL 621587, at *1 (Fed. Cl. Spec. Mstr. Jan. 24, 2025) (citing *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)); *see also Goring v. Sec'y of Health & Hum. Servs.*, No. 16-1458V, 2019 WL 3938705, at *21 (Fed. Cl. Spec. Mstr. May 6, 2019). Therefore, a petitioner merely having received a non-covered vaccine at the same time as a covered one would not suffice to cast doubt on an otherwise viable claim under Section 13(a)(1)(B) of the Vaccine Act.

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages.

**By no later than Friday, June 26, 2026, Petitioner shall file a Status Report updating me on the parties' efforts towards informally resolving damages.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

14